IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. SEAN BLEDSOE, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:00-CV-0083 ) Judge Haynes |
| COMMUNITY HEALTH SYSTEMS, INC. and SPARTA HOSPITAL CORPORATION d/b/a WHITE COUNTY COMMUNITY HOSPITAL, | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM

Plaintiff-Relator, Sean Bledsoe ("Relator"), filed this qui tam action on February 17, 1998, and the gravamen of Relator's qui tam complaint is that Defendant Community Health Services, Inc. ("CHS") and a number of its subsidiaries fraudulently billed Medicare and Medicade in violation of the False Claims Act, 31 U.S.C. §§ 3129-3133. According to his complaint, Relator provided to the United States Government contributed to a $31,000,000.00 Settlement Agreement between the Government and CHS (the "Settlement Agreement"), thereby entitling Relator to a portion of the settlement proceeds.

### A. PROCEDURAL HISTORY

In a Memorandum and Order dated September 18, 2001 (Docket Entry Nos. 142-143), this Court dismissed with prejudice Relator's First Amended Complaint on the grounds that Relator's allegations were neither pled with sufficient specificity under Rule 9(b) of the Federal Rules of Civil Procedure, nor stated a cause of action. Relator appealed this Court's ruling (Docket Entry No. 144), and the Sixth Circuit reversed this Court's order of dismissal without prejudice to

allow Relator to file a second amended complaint and remanded the case to this Court for further proceedings. United States ex rel. Bledsoe v. Cmty. Health Servs., Inc., 342 F.3d 634 (6th Cir. 2003). More particularly, the Sixth Circuit ordered this Court as follows:

> In the present case, the original complaint's allegations that Defendants engaged in 'miscoding and upcoding items billed to Medicare and Medicade' indicates that there may exist overlap between the settlement agreement's contemplated FCA violations and Relator's allegations. However, this statement in itself is too broad to support a factual finding of overlap. In other words, Relator must provide more concrete evidence that he apprised the government of Defendants' DRG coding violations.... If the Relator satisfactorily complies with Rule 9(b)'s particularity requirement, and the district court is satisfied that it has subject matter jurisdiction...., the district court will then determine whether the conduct contemplated in the.... Settlement Agreement overlaps with the conduct alleged by Relator in bringing his action."

Id. at 651.

In July 2004, Relator filed a second amended complaint against Defendants CHS and Sparta Hospital Corporation d/b/a White County Community Hospital. (Docket Entry No. 159; see also Docket Entry No, 165, Order granting motion to recognize second amended complaint). In his second amended complaint, Relator asserted that Defendants "knowingly presented, caused to be presented, or conspired to present to an officer or employee of the United States, numerous false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729," and "conspired with each other and others to defraud the government by acting collectively to submit or cause to be submitted false and fraudulent claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(3)." (Docket Entry No. 159 at ¶¶ 95, 100). Specifically, and at least partially alleged in Relator's first amended complaint, Relator alleged that Defendants' acts included: (1) "fraudulent use of provider numbers," (2) "fraudulent billing of continuous monitoring services," and (3) "upcoding and miscoding of CPT and DRG codes." Id. at ¶¶ 17-22, 30-87. Relator also asserts

claims, heretofore unalleged, of: (4) "fraudulent billing of equipment and supplies," (5) "fraudulent billing of laboratory tests," and (6) "fraudulent cost reports." Id. at ¶¶ 23-29, 92-93. In addition, the second amended complaint discusses the nature of communications Relator had with the Government regarding Defendants' alleged "upcoding and miscoding of CPT and DRG codes." Id. at ¶¶ 70-79, 83-87.

On July 19, 2004, the Government filed with the Court a motion for judgment on Relator's claim to a share of the settlement (Docket Entry No. 166), contending, in sum: (1) that the Relator did not plead allegations that overlap with the specific matters released by the Settlement Agreement; (2) that the oral allegations do not provide a basis for an award to Relator; and (3) that allegations in the second amended complaint which have no antecedent in the original complaint cannot provide a basis for an award to Relator.

On July 30, 2004, Defendants filed a renewed motion to dismiss (Docket Entry No. 171), arguing, in sum: (1) that Relator's allegations fail to satisfy Rule 9(b)'s specificity requirement, particularly in the second amended complaint's failure to name employees of Defendants involved in the alleged activity, a relevant time period, or false claims for payment, (2) that Relator's new allegations are barred by the statute of limitations under 31 U.S.C. § 3730, and (3) that Relator's claim of conspiracy under the False Claims Act fails under Rule 9(b). CHS also filed a renewed motion to dismiss (Docket Entry No. 173), contending that Relator fails to plead a False Claims Act claim against CHS in accordance with Rule 9(b), and that CHS cannot be liable for the acts of its subsidiary.

In its Memorandum and Order (Docket Entry Nos. 195, 196), this Court granted Defendants' motions to dismiss, in part, dismissing Relator's conspiracy claim, (Docket Entry No. 195,

3

Memorandum at 47-49), and several of Relator's allegations as either insufficiently pled, see id. at 46-67, or time-barred, id. at 49-58. Accordingly, Relator's claims for alleged fraudulent billing for continuous monitoring services (Docket Entry No. 159, ¶¶ 19-22), unbundling of setup fees, daily fees and components of kits (Id. at ¶¶ 26-27), and DRG upcoding and miscoding for bronchitis and asthma (Id. at ¶¶ 65-67, 30, 33 to the extent they apply), were allowed to proceed. Relator's factual allegations concerning his involvement in the Government's investigation of Defendants' alleged False Claims Act violations, to the extent they relate to Relator's remaining claims, survived dismissal as well.

The Court set an evidentiary hearing on the remaining claims "[b]ecause the Sixth Circuit ordered this Court to conduct an evidentiary hearing on the issue of the possible overlap between the Settlement Agreement and Relator's original qui tam action, [and] the Court is bound by th[at] order[.]" The Court also ordered that the evidentiary hearing would address "the overlap between the Settlement Agreement between the Government and CHS, and the information Relator provided to the Government." (Docket Entry No. 195, Memorandum at 32, 58).

The Court denied without prejudice the Government's motion for judgment on the Relator's claim to a share of the settlement, pending the resolution of that evidentiary hearing. Id. In preparation for this hearing, the Court set a discovery conference for January 28, 2005, to address the need for discovery on Relator's motion to recognize the Settlement Agreement. Id. at 58. At this conference the Court decided that the issues at the hearing would be on "[a]ny overlap between the Settlement Agreement and the Relator's qui tam action on Relator's remaining claims of DRG upcoding and miscoding. (Docket Entry No. 159, ¶¶ 65-67, and ¶¶ 70-79, 83-87 to the extent they relate to Relator's DRG coding allegations). The Court stated, "if there..... is no finding of overlap,

4

the Relator cannot recover. Upon this Court's ruling on that evidentiary hearing, the Defendants may renew their motion to dismiss these claims." (Docket Entry No. 195, Memorandum at 58).

Prior to the January 28, 2005, discovery conference, the Government filed a pre-hearing brief containing a "suggestion that the discovery conference be converted to a hearing on the merits." (Docket Entry No. 197, Government's Pre-Hearing Brief). The Government contended that Relator's remaining allegations of upcoding and miscoding, for DRG's 96 and 97 (bronchitis and asthma), were not among the DRG claims settled by the United States, and therefore an evidentiary hearing was unnecessary. Id. According to the Government:

> [T]he Settlement Agreement makes clear that none of [R]elator's remaining claims were settled by the United States, and that [R]elator, therefore, has no claim to any of the proceeds of the settlement. The Settlement Agreement is completely and exclusively dispositive of what claims were settled and released by the United States. Relator has acknowledged that he was given a copy of the [S]ettlement [A]greement in March 2000. Accordingly, no further discovery is needed to resolve [R]elator's claim for a share of the settlement.

Id. at 3-4.

In his response, (Docket Entry No. 198), Relator contended that he is not limited to recovery for his surviving claims, but rather "Relator's entitlement to a share [of] the proceeds turn[s] on whether Relator apprised the government of DRG violations." Id. at 2. Relator supported his contention with the Sixth Circuit's conclusion that "'[i]f the government has recovered funds lost from <u>conduct</u> asserted in Relator's <u>qui tam</u> action, then the government has essentially settled Relator's claims.'" Id. at 3 (quoting Bledsoe, 342 F.3d at 649)(emphasis added by Relator). During the January 28, 2005, conference, Relator requested from the Court time to file a supplemental response to the Government's pre-hearing brief, which the Court granted. (Docket Entry No. 201, Transcript of Proceedings at 17-18). In his supplemental response (Docket Entry No. 207), Relator

5

reiterated his previous contention and asserted additionally that the Sixth Circuit's holding requiring an evidentiary hearing was a clear mandate to this Court. In particular, Relator contended that "the Sixth Circuit's opinion place[d] the focus of the overlap inquiry squarely on what information Relator provided to the government concerning Defendants' DRG violations and what conduct was settled by the government and Defendants." Id. at 8.

In its reply (Docket Entry No. 209), the Government argued that Relator's "claim to a share of a FCA recovery arises from the lawsuit he files," and reiterated its earlier assertion that no overlap exists between the Settlement Agreement and Relator's remaining claims. Id.

In an April 15, 2005, Memorandum and Order (Docket Entry Nos. 210, 211), this Court affirmed its earlier Memorandum and Order, dated January 6, 2005 (Docket Entry Nos 195, 196), holding that this Court would "conduct an evidentiary hearing concerning the overlap between Relator Sean Bledsoe's remaining claims against Defendants under the False Claims Act and the May 8, 2000 Settlement Agreement entered into between the Defendants and the United States."

On September 8, 2005, this Court held an evidentiary hearing. (Docket Entry No. 231, Transcript of Proceedings). Based on the evidence presented and the reasons discussed herein, the Court finds that the Relator's second amended complaint (Docket Entry No. 159), together with the proof offered at the evidentiary hearing, are legally insufficient to entitle Relator to any share of the settlement proceeds.

### B. FINDINGS OF FACT

The issue now before the Court is whether the information that Relator provided to the government led to the government's settlement agreement with the Defendant hospitals. (Docket Entry Nos. 210, 211, Memorandum and Order).

6

1. The Settlement Agreement

In 1997, CHS conducted an "internal chain-wide audit" of CHS's practice of misdiagnosing patients by submitting the Medicare ICD-9-CM diagnosis codes and diagnostic related groups ("DRGs") for claims relating to inpatient discharges that were not supported by the patient's medical records.[1] By submitting these incorrect DRGs, CHS hospitals received greater reimbursement from Medicare than what the hospitals were otherwise entitled. Such practices violate the reimbursement provisions of Medicare Part A, 42 U.S.C. §§ 1395c through 1395i-5.[2] Upon discovering these irregularities, on December 19, 1997, CHS met with the Office of Inspector General of the United States Department of Health and Human Services ("OIS-HHS"). (Docket Entry No. 170, Exhibit 8, attached thereto, Morris Declaration at ¶ 5). CHS continued its audit under the direction of OIG-HHS, and in September 1999, the United States and CHS agreed to a settlement amount of $30,904,625.56. Id. at ¶¶ 11, 15.

In May 2000, the United States and CHS executed a Settlement Agreement relating to CHS's alleged practice of reporting inaccurate patient diagnoses in connection with claims for the admission of Medicare beneficiaries to hospitals owned by CHS. By submitting inaccurate

---

[1] Hospitals report patient diagnoses to Medicare using codes established in the International Classification of Diseases, Ninth Edition, Clinical Modification ("ICD-9-CM"). A hospital's assignment of an ICD-9-CM diagnosis code is "grouped" into a DRG classification that determines the amount Medicare will reimburse the hospital for a beneficiary's discharge. See 42 C.F.R. §§ 412.1, 412.60.

[2] The Medicare statute consists of four such "Parts." Part B is an elective insurance program for the elderly and covers, for the most part, doctors' and ancillary services as well as various outpatient items and services, such as blood testing and x-rays. Part C is the Medicare Choice managed care program, 42 U.S.C. §§ 1395w-21 through 1395w-29, and the recently-created Part D, 42 U.S.C. §§ 1395w-101 through 1395w-152, is a voluntary precsription drug benefit program.

7

diagnostic information, CHS had caused the beneficiaries for whom the claims were submitted to be classified into higher-paying DRGs. The release clause in the Settlement Agreement states that, conditioned on CHS's full payment of the settlement amount,

> the United States... agrees to release CHS [and its affiliates] from any civil or administrative monetary claim the United States has or may have for the Covered Conduct for the time period specified for each [hospital] listed in Attachment A....

CHS Settlement Agreement, ¶ 5-8.

The term "Covered Conduct" is defined in the Settlement Agreement as:

> the CHS hospitals listed on Attachment A for the time periods described in Attachment A, submitted or caused to be submitted claims to Medicare, Medicade and TRICARE claims for ICD-9-CM diagnosis codes for inpatient admissions grouping to the **covered DRGs** that were not supported by the patient's medical records and as a consequence received greater reimbursement than that to which they were entitled for those admissions....

CHS Settlement Agreement, Preamble, ¶ I (emphasis added). The term "covered DRGs" is defined as those DRGs that were the subject of:

> a self-audit of inpatient claims submitted by CHS to the Medicare program that grouped to the following DRGs: 014, 079, 087, 132, 138, 296, 416, and 475 (the "covered DRGs").

CHS Settlement Agreement, Preamble, ¶ F.

By prior Order of this Court, dated January 6, 2005, various claims stated by Relator against CHS in his second amended complaint were dismissed because they were not pled with particularity as required by Fed. R. Civ. P 9(b) - including certain allegations relating to false diagnostic information reported in connection with DRGs. (Docket Entry No. 196, Memorandum at 44). Included among the dismissed claims were Relator's allegations regarding DRG 079 (pneumonia). The DRG allegations in the second amended complaint which were not dismissed concern DRGs

8

096 and 097 (bronchitis and asthma). Id. at 58. DRGs 096 and 097 are not among the "covered DRGs" listed in the Settlement Agreement.

Other allegations in the second amended complaint that survived dismissal include "fraudulent billing" by White County Community Hospital in connection with continuous telemetry monitoring services, equipments and supplies, and CPT Codes 9464, 94799, and 99201 (relating to respiratory therapy). Id. at 41-43. None of these claims are part of the Settlement Agreement, therefore it is unnecessary to discuss information related to those claims. The Court will discuss information provided to the government by Relator regarding DRG coding.

2.   Relator's Communications with the Government Regarding DRG Coding

a.) Relator's communications with Jennifer King.

Relator relies on weekly communications taking place during 1996-1997 with Jennifer King, an evaluator with the Office of the Inspector General of the Department of Health and Human Services, to show that he apprised the government about DRG violations. (Docket Entry No. 230 at 5, Relator's Proposed Findings of Fact and Conclusions of Law). Relator stated that he told Ms. King that the hospital was diagnosing patients with pneumonia even though they had clear x-rays or never had a sputum culture or gram stain performed. Id. at 6. Relator also stated that he spoke with Ms. King about "upcoding and misdiagnosing patients" and the "upcoding of diagnosis codes and miscoding of diagnosis codes for pneumonia, and the admission of patients with secondary diagnosis which did not exist." Id. at 8-9.

In a declaration, dated April 5, 2001, Ms. King stated that she had indeed discussed "a wide variety of problems... regarding many questionable billing practices that he suspected were fraudulent... including, but not limited to, upcoding, billing for services not rendered, improperly

9

billing for emergency room services, double billing, misdiagnosing patients and other methods of maximizing hospital profits." (Docket Entry No. 113 at ¶ 4, King Declaration, filed under seal). At a deposition taking place on August 29, 2005, Ms. King testified as follows:

> Q: Do you recall any conversations you had with [Relator] in that year and a half that you spoke with him about his fraud allegations?
> A: General things.
> Q: Okay. Tell me what you remember generally.
> A: General things such as these. That he had suspicions of these things occurring, but I don't remember specifics.
> Q: Okay. So all of these things that are listed in here [in your declaration] you remember you talked to him about.
> A: In general.
> Q: But you don't remember any specifics?
> A: No.
> Q: Is it fair to say that he gave you specifics, but you just don't recall them?
> A: Yes.
>
> \* \* \* \* \*
>
> Q: Is there any particular reason why your statement doesn't contain more specific details, your declaration?
> A: Sean, [the Relator], talked about a lot of things, a lot of suspicions, but I didn't have concrete things, nor would I have known if it was fraud and abuse.

(Evidentiary Hearing, Relator's Exhibit 2, King Deposition at 33-34).

Upon receiving the information from Relator, Ms. King contacted her supervisor who advised Ms. King that the Office of Investigations would not likely take the case without substantial evidence. Ms. King was then advised to refer Relator to the State of Tennessee Medicade Fraud Control Unit or OIG's fraud hotline. Id. at ¶ 5. After contacting the State of Tennessee Bureau of Investigations to inform them that Relator might be contacting them regarding the alleged fraud, Ms. King considered the matter closed and took no further action. Id. at ¶¶ 6-7.

b.) Relator's interviews with the government.

Relator relies on his June 1, 1998, interview with a number of government representatives, including Special Agent Derrick Jackson. (Docket Entry No. 230 at 13). The report of that

10

interview, as prepared by Agent Jackson, is contained in an OI-3 form, which describes the information and statements obtained from Relator during that interview and is used by government attorneys and investigators. Id. (see also Docket Entry No. 114, Jackson Declaration, filed under seal; Docket Entry No. 229 at 15). Agent Jackson prepared the OI-3 reports immediately after each interview and did not have any knowledge of a DRG settlement agreement between the government and CHS until the Spring of 2001. (Docket Entry 229 at 15; see also Docket Entry 114 at ¶ 10).

Relator states that he gave the government information regarding CPT upcoding, including specific codes that were "upcoded," the names of witnesses, the name of the billing consultant company that had contracted with the Defendant to provide revenue enhancement to the Defendant hospitals. (Docket Entry No. 230 at 13-16). Relator does not state any information provided by him during this interview regarding DRG codes. Id.

Agent Jackson declared that Relator provided no information during the interview regarding DRG coding. (Docket Entry No. 114 at ¶5). Agent Jackson's report of the interview, the OI-3, lists no information regarding DRG coding. Id., Ex. A.

Relator also relies on his August 4, 1998 interview with a number of government officials, including Special Agent Jackson, who prepared a report of the interview, and Cindy Peck, now Cindy Bledsoe. (Docket Entry 230 at 16, see also Docket Entry No. 114, Ex. B) Relator testified that both he and Mrs. Bledsoe discussed Defendants' upcoding of DRGs with Agent Jackson, including discussion of "a DRG audit, case mix index, the average length of [stay] for the pneumonia DRGs, specifically DRG 079." Id. at 17. Relator testified that he and Mrs. Bledsoe discussed with Agent Jackson that "the average length of stay for DRG 79 as reflected in the report was only 3.1 days, where the national average was eight days." Id. Relator testified that he and Mrs.

11

Bledsoe "went over patient bills with Agent Jackson focusing on the primary diagnosis codes and explained to him how it was affecting the case mix index resulting in increased reimbursement to Defendants." Id. Relator also testified that he discussed CPT coding with Agent Jackson. Id.

Mrs. Bledsoe testified that Relator "discussed DRG upcoding while going through the audit report [with Agent Jackson]. She testified that the information was presented by Relator, but that she did some explaining as they went through." Id. at 18.

Agent Jackson testified that although Mrs. Bledsoe was present at the time of this interview, she did not provide any information during the interview. (Hearing Transcript at 121.) Agent Jackson also testified that during his interview with Relator, Relator did not describe conduct by anyone associated with White County Hospital whereby they were misrepresenting or miscoding patient diagnosis. Id. at 122. Agent Jackson's OI-3 Report (Docket Entry 114, Ex. B, filed under seal) discusses CPT coding, stating "the tally sheets don't have the appropriate procedures and treatments on them for the therapist to check off what was actually performed and the computer gives the incorrect procedure's CPT code." The report goes on to discuss various other CPT coding problems and states that Relator "played a tape of who he alleged to be Wayne Gilmore talking to him on June 5, 1998 at 3:00 pm. The person on the tape indicated that he knew White Co[unty] C[ommunity] H[opsital] was billing incorrectly. That person also talked about specific billing inconsistences on the tape." Id. The report mentions nothing about DRG miscoding or upcoding. Id.

On August 4, 1998, after Relator's interview with Agent Jackson, Agent Jackson conducted a separate interview with Cindy Peck, now Bledsoe, on which Relator also relies. Relator was not present during this interview. (Docket Entry No. 230 at 19-22). Mrs. Bledsoe presented allegations

12

regarding DRG upcoding and mentioned that she was not looking to benefit from the qui tam suit. Id. at Ex. C. For Relator to recover, he must be an "original source" of the information contained in his complaint, meaning he possesses "direct and independent knowledge of the information on which the allegations are based," and voluntarily provided that information to the government before filing the qui tam action and prior to any public disclosure. United States v. Cmmty. Health Systems, Inc., 342 F.3d 634, 646 (2003). Therefore, what information Mrs. Bledsoe provided to the government is not probative of the issues before this Court.

Agent Jackson declared that the Office of Investigations, Department of Health and Human Services closed its investigation concerning the allegations stated by Relator on November 19, 1998. (Docket Entry No. 114 at ¶ 9, filed under seal).

### c.) Relator's Declarations

Relator submitted Declarations in March 2001 and June 2001. (Disclosure Statement, Hearing Ex. 2). Relator's statement mentions DRGs at one point, but his allegation is different from the matter covered in the settlement agreement between the government and the Defendant hospitals. Relator averred that White County Community Hospital "discharges patients when their DRG payments run out." Id. at 7. The statement further states, however, that this allegation "might not support the claim of upcoding, but is surely a violation of the regulations." Id. The statement does not contain any allegation relating to the misrepresentation or upcoding of DRGs.

## C. CONCLUSIONS OF LAW

The Court adopts and incorporates by reference the relevant legal authorities from its earlier memoranda on the applicable law, and finds that Relator's evidence does not support a finding that Relator's disclosures led, in any way, to the settlement agreement entered into between the

13

government and CHS. The Relator's complaint, together with the proof offered at the evidentiary hearing, are legally insufficient to entitle Relator to any share of the settlement proceeds. The Court finds that the evidence presented does not establish that Relator apprised the government of Defendants' DRG violations either before or after filing this qui tam action, nor do Relator's claims overlap with the settlement agreement entered into by the United States and the Defendants.

Accordingly, this action is **DISMISSED**.

An appropriate Order is filed herewith.

**ENTERED** this the 12th day of December, 2005.

William J. Haynes, Jr.
United States District Judge

14

Case 2:00-cv-00083 Document 232 Filed 12/13/05 Page 14 of 14 PageID #: 630